## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| RICKEY J. JOHNSON SR., <br><br> Plaintiff, <br><br> v. <br><br> EQUIFAX INFORMATION SERVICES, LLC; TRANS UNION, LLC; and SYNCHRONY BANK, <br><br> Defendant. | **Case No.:** 3:26-cv-290-SAL <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Rickey J. Johnson Sr. ("Plaintiff" or "Mr. Johnson"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Trans Union, LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); and Synchrony Bank ("Synchrony"); (all defendants collectively, "Defendants"), and states as follows:

### INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

1

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)]

(emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

3

11.     Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that Plaintiff owed an outstanding balance of $1,738 on a charged off account after the account debt was cancelled by the creditor via a 1099-C Code G.

12.     Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     Plaintiff also brings a claim against Defendant Synchrony for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

15.     Rickey J. Johnson Sr. ("Plaintiff" or "Mr. Johnson") is a natural person residing in Columbia, South Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.     Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of South Carolina, including within this District.

4

17.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of South Carolina, including within this District.

19.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.     Defendant Synchrony Bank ("Synchrony") is a national bank with its headquarters in Utah and is authorized to do business in the State of South Carolina, including within this District.

21.     Synchrony is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

24.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

25.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

26.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

27.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

28.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Factual Background**

29.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

30.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day and also sell credit scores.

31.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

32.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

33.     The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)     Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

      (d)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

34.     The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

35.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

36.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

37.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

38.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

39.     The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

40.     The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

41.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

42.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

43.     The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

44.     The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

45.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

46.     Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

47.    The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**Plaintiff Receives a Cancellation of Debt**

48.    In August 2010, Plaintiff opened a Belk department store credit card which was issued by Synchrony Bank (Account ending in *3772) (the "Account").

49.    On or about January 23, 2022, Plaintiff received a notice for cancellation of debt via 1099-C Code G concerning his Synchrony/BELK Account from Defendant Synchrony.

50.    The G Code is used by a creditor on a 1099-C form to indicate that the creditor has affirmatively decided to discontinue all collection efforts on an account.

51.    In fact, according to the IRS:

**"When is a Debt Canceled?**

A debt is deemed canceled on the date an identifiable event occurs or, if earlier, the date of the actual discharge if you choose to file Form 1099-C for the year of cancellation. An identifiable event is one of the following. . . .

7. A discharge of indebtedness because of a decision or a defined policy of the creditor to discontinue collection activity and cancel the debt. A creditor's defined policy can be in writing or an established business practice of the creditor. A creditor's established practice to stop collection activity and abandon a debt when a particular nonpayment period expires is a defined policy. Enter "G" in box 6 to report this identifiable event."

Instructions for Forms 1099-A and 1099-C (04/2025) | Internal Revenue Service; https://www.irs.gov/instructions/i1099ac#en_US_202504_publink1000284982.

52.    Thereafter, any account debts cancelled by a creditor in a 1099-C form using a G Code should not be reported with a collectible balance on that account in any consumer reports.

53.    Accordingly, as of January 23, 2022, Plaintiff no longer had any further obligation to repay the Account.

54.     Plaintiff listed the cancelled debt on his tax returns as taxable income and paid increased taxes as a result.

**Defendants Report that Plaintiff Still Owes a Balance Associated with the Account**

55.     In or around March or April 2024, Plaintiff reviewed copies of his Equifax and Trans Union credit reports where he learned that the Account with Defendant Synchrony was still being reported with an outstanding balance of $1,738 owed and past due.

56.     Upon information and belief, Defendant Synchrony reported to the Credit Bureau Defendants that Plaintiff still owed a balance on the Account even though Defendant Synchrony cancelled the debt associated with the account in January 2022.

57.     The Credit Bureau Defendants reported to Plaintiff's credit file and credit reports that Plaintiff was past due and owed $1,738.

58.     Plaintiff was confused and distressed by this information. The debt associated with the Account had been cancelled by Defendant Synchrony over two years prior to the reporting and therefore Plaintiff had no more payment obligations on the Account.

**Plaintiff's First Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

59.     In or around April 2024, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the outstanding balance associated with the Account with Defendant Synchrony with each of the Credit Bureau Defendants.

60.     Plaintiff explained that any indication of an outstanding balance or debt owed on the Account with Defendant Synchrony was inaccurate.

61.    Plaintiff further explained that the debt associated with the Account was cancelled or in other terms discharged by Defendant Synchrony via 1099-C Code G.

62.    Plaintiff requested that Equifax and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

63.    Upon information and belief, Equifax sent Defendant Synchrony an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 2024 dispute to Equifax.

64.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

65.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute.

66.    Thereafter, Defendant Equifax failed to correct or delete the outstanding balance on the Account appearing in Plaintiff's credit file.

67.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

68.    Upon information and belief, Trans Union sent Defendant Synchrony an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 2024 dispute to Trans Union.

69.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

70.     Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute.

71.     Thereafter, Defendant Trans Union failed to correct or delete the outstanding balance on the Account appearing in Plaintiff's credit file.

72.     Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's April 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

73.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

74.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

75.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

76.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

77.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued

to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

78.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

79.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

80.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

81.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

82.    The data furnishers, like Defendant Synchrony, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

83.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and returning the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Synchrony's Unreasonable Dispute Reinvestigation**

84.    Upon information and belief, in or around April 2024, Defendant Synchrony received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

85.    Upon information and belief, Defendant Synchrony failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's April 2024 dispute.

86.    Upon information and belief, Defendant Synchrony verified the disputed information as accurate to Defendant Equifax in or around April 2024.

87.    Upon information and belief, in or around April 2024, Defendant Synchrony received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

88.    Upon information and belief, Defendant Synchrony failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's April 2024.

89.    At the time of Plaintiff's April 2024 dispute, Defendant Synchrony had actual knowledge that it cancelled the debt associated with the Account in January 2022 via 1099-C Code G.

90.    Upon information and belief, in or around April 2024, Defendant Synchrony verified the disputed information as accurate to Defendant Trans Union.

91.    Defendant Synchrony violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff Disputes with Defendant Synchrony Regarding the Inaccurate Credit Reporting**

92.     On or about February 18, 2025, extremely shocked, surprised, and embarrassed at the inaccurate information Defendant Synchrony provided to Equifax and Trans Union of the Account still having an outstanding balance of $1,738, Plaintiff disputed the outstanding balance associated with the Account with Defendant Synchrony.

93.     Plaintiff explained that any indication of an outstanding balance or debt owed on the Account with Defendant Synchrony was inaccurate.

94.     Plaintiff further explained that the debt associated with the Account was cancelled or in other terms discharged by Defendant Synchrony via 1099-C Code G.

Plaintiff requested that Defendant Synchrony reinvestigate and correct the disputed information to reflect accurately on his credit reports.

**Defendant Synchrony's Unreasonable Dispute Reinvestigation**

95.     Upon information and belief, Defendant Synchrony failed to respond to Plaintiff's dispute tendered February 18, 2025.

96.     Upon information and belief, Defendant Synchrony failed to review all relevant information provided by Plaintiff regarding Plaintiff's dispute tendered February 18, 2025.

97.     Upon information and belief, in or around February 2025, Defendant Synchrony verified the disputed information as accurate and continued reporting that information to the Credit Bureau Defendants.

98.     At the time of Plaintiff's February 2025 dispute Defendant Synchrony had actual knowledge that it cancelled the debt associated with the Account in January 2022 via 1099-C Code G.

99.     Defendant Synchrony violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant

information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff's Second Dispute to Defendant Trans Union Regarding the Inaccurate Credit Reporting**

100.     As of July 2025, Defendant Trans Union was reporting that Plaintiff still had an outstanding balance on the Account with Defendant Synchrony.

101.     In or around early July 2025, extremely shocked, surprised, and embarrassed at Trans Union's continued inaccurate reporting, Plaintiff disputed the outstanding balance associated with the Account with Defendant Synchrony with Defendant Trans Union.

102.     Plaintiff explained that any indication of an outstanding balance or debt owed on the Account with Defendant Synchrony was inaccurate.

103.     Plaintiff further explained that the debt associated with the Account was cancelled or in other terms discharged by Defendant Synchrony via 1099-C Code G.

104.     Plaintiff requested that Defendant Trans Union reinvestigate the disputed information, correct the reporting, and to send him a corrected copy of his credit report.

**Defendant Trans Union's Unreasonable Reinvestigation**

105.    On or about July 15, 2025, Plaintiff received Defendant Trans Union's correspondence responding to Plaintiff's July 2025 dispute stating that it had investigated the disputed information and revised its reporting.

106.    However, upon review of his report, Plaintiff discovered that Defendant Trans Union continued to report the Account with an outstanding balance of $1,738

107.    Upon information and belief, Defendant Trans Union sent Defendant Synchrony an automated credit dispute verification ("ACDV") pursuant to Plaintiff's July 2025 dispute to Defendant Trans Union.

108.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

109.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's July 2025 dispute.

110.    Thereafter, Defendant Trans Union failed to correct or delete the outstanding balance of $1,738 on the Account appearing in Plaintiff's credit file.

111.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's July 2025 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Synchrony's Unreasonable Dispute Reinvestigation**

112.    Upon information and belief, in or around July 2025, Defendant Synchrony received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

113.    Upon information and belief, Defendant Synchrony failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's July 2025 dispute.

114.    Upon information and belief, in or around July 2025, Defendant Synchrony verified the disputed information as accurate to Defendant Trans Union.

115.    At the time of Plaintiff's July 2025 dispute Defendant Synchrony knew or had knowledge that it cancelled the debt associated with the Account in January 2022 via 1099-C Code G.

116.    Defendant Synchrony violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff's Second Dispute to Defendant Equifax and Third Dispute to Defendant Trans Union Regarding the Inaccurate Credit Reporting**

117.    As of July 2025, Defendant Equifax reported that Plaintiff still had an outstanding balance of $1,738 on the Account with Defendant Synchrony.

118.    As of July 2025, Defendant Trans Union was reporting that Plaintiff had an outstanding balance of $1,738 on the Account with Defendant Synchrony.

119.    On or about July 30, 2025, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the outstanding balance of $1,738 associated with the Account with Defendant Synchrony with each of the Credit Bureau Defendants via certified mail.

120.    Plaintiff explained that any indication of an outstanding balance or debt owed on the Account with Defendant Synchrony was inaccurate.

121.    Plaintiff further explained that the debt associated with the Account was cancelled or in other terms discharged by Defendant Synchrony via 1099-C Code G.

122.    Plaintiff requested that Equifax and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

**Defendant Equifax's Unreasonable Reinvestigation**

123.    Upon information and belief, Defendant Equifax sent Defendant Synchrony an automated credit dispute verification ("ACDV") pursuant to Plaintiff's July 30, 2025, dispute to Defendant Equifax.

124.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

125.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's July 30, 2025, dispute.

126.    Thereafter, Defendant Equifax failed to correct or delete the outstanding balance of $1,738 on the Account appearing in Plaintiff's credit file.

127.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered July 30, 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Synchrony's Unreasonable Dispute Reinvestigation**

128.    Upon information and belief, in or around July or August 2025, Defendant Synchrony received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

129.    Upon information and belief, Defendant Synchrony failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's July 30, 2025, dispute.

130.    Upon information and belief, in or around July or August 2025, Defendant Synchrony verified the disputed information as accurate to Defendant Equifax.

131.    Upon information and belief, in or around July or August 2025, Defendant Synchrony received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

132.    Upon information and belief, Defendant Synchrony failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's July 30, 2025, dispute.

133.    Upon information and belief, in or around July or August 2025, Defendant Synchrony verified the disputed information as accurate to Defendant Trans Union.

134.    At the time of Plaintiff's July 30, 2025, dispute Defendant Synchrony knew or had knowledge that it cancelled the debt associated with the Account in January 2022 via 1099-C Code G.

135.    Defendant Synchrony violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

136. Plaintiff reasonably believes that Defendant Synchrony continued to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff owes an outstanding balance of $1,738 on the Account with Defendant Synchrony.

137. Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff owes an outstanding balance of $1,738 on the Account with Defendant Synchrony and/or fail to publish accurate information of the Account at all.

138. In fact, as of the date of this Complaint, Defendant Equifax is still reporting the Account with an outstanding balance of $1,738.

139. As a result of the inaccurate outstanding balance on the Account, and despite having the debt associated with the Account cancelled by Defendant Synchrony in January 2022 via 1099-C Code G, the Defendants damaged Plaintiff's credit rating and made it practically impossible for Plaintiff to continue his efforts to improve his credit rating.

140. Defendants' inaccurate reporting caused Plaintiff to be riddled with an immense amount and stress and worry over the thought of having to repay a balance for which he no longer owed, compounded by both his age and his living on a fixed income.

141. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

142. At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

143. As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the

credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

144.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

145.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax and Trans Union)

146.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

147.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

148.    On numerous occasions, Defendants Equifax and Trans Union prepared patently false consumer reports concerning Plaintiff.

149.    Defendants Equifax and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

150.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

151.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

152.    As a result of Defendants' Equifax and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

153.    Defendants Equifax and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be

determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

154.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax and Trans Union)**

155.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

156.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

157.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

158.    On multiple occasions during the past two years, Plaintiff disputed the inaccurate information with Equifax and Trans Union and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the outstanding balance of $1,738 in relation to Plaintiff's account with Defendant Synchrony.

159.    In response to Plaintiff's disputes, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

160.    In response to Plaintiff's disputes, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

161.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

162.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

163.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

164.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer
### (Only Claim for Relief Against Defendant Synchrony)

165.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

166.    Defendant Synchrony furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax and Trans Union.

167.    Defendant Synchrony violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax and Trans Union.

168.    As a result of Defendant Synchrony's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

169.    Defendant Synchrony's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

170.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Synchrony in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 27th day of January 2026.

*/s/ Dawn McCraw*
Dawn McCraw (Fed ID No. 13710)
Consumer Justice Law Firm PLC
8095 N 85th Way
Scottsdale, AZ 85258
T: (602) 807-1527
F: (480) 613-7733
E: dmccraw@consumerjustice.com

*Attorneys for Plaintiff*
*Rickey J. Johnson Sr.*

28